UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERENCE B. WAITES,

      Plaintiff,                 Civil Action No. 13-12914

          v.                District Judge DENISE PAGE HOOD
                              Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Terence B. Waites ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On February 15, 2011, Plaintiff applied for DIB , alleging disability as of January 20, 2010 (Tr. 102-104). Following the initial denial of benefits, Plaintiff requested an

-1-

administrative hearing, held on January 4, 2012 in Oak Park, Michigan (Tr. 24). Patricia S. McKay, Administrative Law Judge ("ALJ") presided. Plaintiff, represented by attorney Heidi Walkon, testified (Tr. 30-52), as did Vocational Expert ("VE") Erin O'Callaghan (Tr. 52-60). On January 25, 2012, ALJ McKay found Plaintiff not disabled (Tr. 20). On May 16, 2013, the Appeals Council denied review (Tr. 1-5). Plaintiff filed suit in this Court on July 3, 2013.

## BACKGROUND FACTS

Plaintiff, born July 11, 1957, was 54 when ALJ McKay issued her decision[1] (Tr. 20, 102). He completed 12th grade, received an apprenticeship as a rigger followed by work as a rigger (Tr. 144-145). His application for benefits alleges disability as a result of diabetes, eye conditions, knee problems, neuropathy of the feet, hepatitis C, and recurrent skin infections (Tr. 143).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony.

He stood 6' 6" and weighed 165 to 170 pounds (Tr. 31). He was currently involved in divorce proceedings, and for the past two years had lived in a one-story home in Clinton Township, Michigan with a friend (Tr. 31). He was able to use the basement stairs occasionally, but was unable to use the stairs and carry laundry simultaneously (Tr. 32).

---

[1]However, Plaintiff testified at the administrative hearing that his birth date was July 1, 1957 (Tr. 31).

Plaintiff received a three year apprenticeship and worked previously as a journeyman rigger (Tr. 32). The position required moving heavy machinery with the use of a "hi-lo" and driving semi-trucks (Tr. 32). His work as a semi-truck driver involved loading and unloading trucks (Tr. 34). He performed truck driving work locally (Tr. 34). He was retired from the truck driving work and was "not allowed to do it in this area," adding that he did not believe that he was capable of climbing "up and down off trucks" (Tr. 34). His work as a hi-lo driver involved supervising others (Tr. 35).

In the past two years, Plaintiff had completed a course in "alternative fuel for hybrids" offered by the Michigan Works program (Tr. 33). Due to diabetes, he believed that he was unable to pass a Michigan Department of Transportation ("DOT") physical to renew his chauffeur's license (Tr. 36). He stopped working in January, 2010, then collected unemployment for the next six months until he became eligible to retire (Tr. 36). He continued to collect unemployment benefits between the time he began collecting a pension and filing the DIB claim (Tr. 37).

Plaintiff did not participate in volunteer activities but was "always looking" for remunerative work (Tr. 38). He was capable of "sit down" work as long as he could change positions every 30 minutes (Tr. 38). He held a current driver's license and continued to drive short distances (Tr. 38).

On a typical day, Plaintiff would arise at 10:00 a.m., drink coffee, eat breakfast, watch television, sweep the floor, walk, and recline (Tr. 39). He was able to prepare simple meals,

care for his personal needs, and care for a small dog (Tr. 39-40). On a good day, he was able to perform laundry chores (Tr. 40).

Plaintiff had been diagnosed with juvenile diabetes and was required to take insulin shots (Tr. 40). Range of motion limitations of the knee created walking and standing problems (Tr. 41). He had been told that he required a total knee replacement, but was unable to afford the procedure (Tr. 41). In addition to the knee condition, he had sustained two wrist fractures, a staph infection requiring hospitalization, foot numbness, a right eye cataract, and cramping of the feet, legs, and hands (Tr. 43). He took Norco for body pain, but denied side effects (Tr. 43).

Plaintiff did not smoke or use street drugs but drank alcohol on a social basis (Tr. 44). He held a medical marijuana card (Tr. 44). He currently received treatment from a primary doctor (Dr. Rivera), an endocrinologist (Dr. Kurian), and an orthopedic surgeon (Dr. Teitge) (Tr. 44).

In response to questioning by his attorney, Plaintiff testified that he had experienced a hemorrhage of the right retina due to retinopathy, noting that the condition had been treated with laser surgery (Tr. 46). He reported macular eye degeneration, alleging "floaters" and blurred vision in the left eye (Tr. 46). He required glasses for reading and distance vision (Tr. 46). In addition to eye problems, Plaintiff reported that his knee condition was characterized by grinding, cracking, creaking, soreness, and range of motion limitations (Tr. 47). He coped with the condition by massage, walking, and changing positions (Tr. 47). He

was unable to stand for more than 20 minutes or walk for more than one block (Tr. 47).  He was unable to lift significant weights due to shoulder and knee pain (Tr. 47).  He experienced problems reaching and throwing due to left shoulder problems (Tr. 49).  Hand and finger numbness limited his ability to perform fine manipulative activities (Tr. 48).   Exertional, postural, and manipulative limitations prevented him from engaging in fishing, hunting, and riding motorcycles (Tr. 49).

### B.   Medical Evidence

### 1. Treating Sources

March, 2007 treating notes state that Plaintiff had experienced knee pain since a May, 2006 motorcycle accident (Tr. 286).   In August, 2007 Plaintiff underwent a right knee arthroplasty (Tr. 283).   In November, 2007, orthopedic surgeon Robert A. Teitge, M.D. noted that Plaintiff's right knee condition had improved significantly since undergoing arthroplasty (Tr. 280, 282, ).  Dr. Teitge remarked that Plaintiff was now back at work but might require a total knee replacement in the future (Tr. 280).   In June, 2009, Plaintiff sought emergency treatment after injuring his left wrist in a "slip and fall" (Tr. 166).  He was diagnosed with a wrist fracture (Tr. 167).   Several days later, Plaintiff sought emergency treatment again after his left shoulder was struck by a car door (Tr. 164).  He was diagnosed with a possible rotator cuff tear (Tr. 165).  Imaging studies were negative for fractures (Tr. 165, 171).  In October, 2009, Plaintiff received treatment for a respiratory condition (Tr. 234).  He denied additional health problems (Tr. 234).

June, 2010, endocrinology treating notes state that Plaintiff appeared well and did not show signs of hepatitis C (Tr. 178).   In July, 2010, Plaintiff sought emergency treatment for a puncture wound to the foot (Tr. 227).   Upon discharge, he was prescribed antibiotics (Tr. 229, 233).   The next day, a post-hospitalization examination was unremarkable, except for reports of joint pain (Tr. 225).   November, 2010 endocrinology treating notes state that Plaintiff appeared well (Tr. 175-176).   The following month, he was admitted for inpatient treatment for left hand and forearm cellulitis (Tr. 180).   Upon discharge, he was prescribed oral and topical antibiotics (Tr. 180).   Blood tests showed glucose levels "in the normal range" (Tr. 187).   He denied diabetic retinopathy (Tr. 190). A post-hospitalization checkup was unremarkable (Tr. 211).   The same month, Aleida Rivera, M.D. performed a physical examination, noting Plaintiff's report of recent heart palpitations (Tr. 208).   Plaintiff reported that he exercised daily in a manner "appropriate for [his] age and health" (Tr. 209).   Dr. Rivera noted no range of motion restrictions and normal muscle strength and gait (Tr. 209). She observed that Plaintiff was "well developed" and "well nourished" (Tr. 210).   He was negative for symptoms of neuropathy (Tr. 211).

In March, 2011 Plaintiff underwent a laser procedure after being diagnosed with a vitreous hemorrhage related to diabetic retinopathy of the right eye (Tr. 257- 258).   The procedure was performed without complications (Tr. 258).   An examination of the left eye was unremarkable (Tr. 245).   Treating notes state that Plaintiff experienced good blood sugar control (Tr. 245).   The same month, Dr. Teitge, noting that he had not treated Plaintiff in two

years, remarked that Plaintiff experienced "pain with ambulation" (Tr. 277).  He opined that Plaintiff needed to walk periodically due to the knee pain (Tr. 277), concluding that Plaintiff was "clearly disabled from the requirements of repairing and moving heavy factory machinery" (Tr. 278).  In June, 2011, Dr. Teitge opined that due to a posterior subluxed tibia and "global arthritis," Plaintiff would be unable to return to his work as an "iron worker" even assuming that he received a total knee replacement (Tr. 276).  Dr. Rivera's notes from the following month state that Plaintiff sought disability for severe muscle cramps, a right eye cataract, and a right shoulder rotator cuff tear (Tr. 292).  Dr. Rivera noted that symptoms of diabetes were well controlled (Tr. 292).  She prescribed Xanax in response to Plaintiff's reports of anxiety (Tr. 293).   The same month, Plaintiff reported constant "halos" in his arc of vision, noting that they interfered with his driving (Tr. 303).

In August, 2011, Dr. Teitge completed another work related activities assessment, finding that Plaintiff's prognosis as a result of knee problems was poor (Tr. 260).  Dr. Teitge noted that Plaintiff experienced a limited range of knee motion (Tr. 260).  He found that Plaintiff was limited to carrying 15 pounds for one hour in an eight-hour workday (Tr. 260).  He found that Plaintiff was unable to walk for more than 10 minutes at a time and was precluded from walking for more than one hour in an eight-hour workday (Tr. 261).  He concluded that Plaintiff would require at least four days of absences each month and was precluded from all climbing (Tr. 262).  In October, 2011, Plaintiff reported that his vision was worsening (Tr. 300).   Medical records state that he currently smoked and drank (Tr.

300).   James R. Valice, M.D. noted that while Plaintiff did not show signs of diabetes-

related complications, a cataract was worsening (Tr. 302).  Jay I. Novetsky, M.D. opined that

new glasses would improve both near and distance vision (Tr. 306).

### 2.  Evidence Submitted After the ALJ's January 25, 2012 Decision[2]

On August 9, 2011, Dr. Teitge completed a Medical Questionnaire, opining that

Plaintiff was limited by knee pain and loss of motion.  *Docket #11-1* at 3.  He stated that

"Next recommendation is total knee replacement."  *Id.* at 4.  He found that Plaintiff's

prognosis was fair.  *Id.*  He indicated that Plaintiff was unable to perform full-time work,

referring to the March, 2011 "disability" opinion.  *Id.* (citing Tr. 278).  He noted "constant

pain [with] ambulation, limited motion, [and] weakness," noting that while Plaintiff was

qualified as an iron worker, he was unable to perform the job with a "non-functioning knee."

*Id.*

### D.  Vocational Expert Testimony

VE Erin O'Callaghan classified Plaintiff's past work as a journeyman rigger as skilled

at the heavy exertional level and truck driver, semiskilled, heavy[3]  (Tr. 51).   ALJ McKay

---

[2]Exhibit 11F was also added subsequent to the administrative decision (Tr. 5, 313-
317).  However, these pages duplicate evidence considered by the ALJ and has been
included along with other treating source material (Tr. 26–263)

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at
a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that

then posed the following question to the VE, describing an individual of Plaintiff's age, education, and work experience with the following limitations:

> Let's assume we have a hypothetical claimant . . . with the residual functional capacity to perform the full range of light exertional work but with the following additional limitations. This hypothetical claimant needs to be limited to work such as, or activities such as climbing stairs and crouching and crawling and kneeling and stooping and bending on an occasional basis only, not more often such as frequently. He needs to avoid climbing ladders. He needs to avoid working around unprotected heights, dangerous moving machinery. With those limitations would this hypothetical claimant be able to perform any of Mr. Waites' past work either as he performed it or as it is generally performed in the national economy (Tr. 53)?

The VE testified that the above limitations would preclude Plaintiff's past relevant work but would allow for the light, unskilled work of an inspector (12,000 positions in the local economy) and small products assembler (6,000) (Tr. 53-54). The VE testified further that if the same individual were allowed to change positions from sitting to standing at will, the job numbers would be reduced by 20 percent (Tr. 54). She stated that if the individual were limited to frequent (as opposed to constant) reaching with the left (non-dominant) arm, the job numbers would be unaffected (Tr. 54). However, if the individual were limited by the need to avoid to jobs requiring "fine visual acuity," the job numbers would be additionally reduced by "50 to 60 percent" (Tr. 54). She testified that the need for a sit/stand option,

---

exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

combined with the preclusion on jobs requiring fine visual acuity would reduce the job numbers to 3,500 in the local economy (Tr. 55).

The VE stated that a preclusion on crouching, kneeling, or crawling, or a limitation to "frequent use" of the "bilateral upper extremities for gross manipulation" would not affect the job numbers (Tr. 55-56). She testified further that if the same individual were also limited to "simple, routine, or repetitive" work, the job numbers would remain unchanged (Tr. 56). However, she stated that if the individual were obliged to take unscheduled breaks during the course of the workday, all work would be precluded (Tr. 56). She stated that if Plaintiff's testimony were fully credited, he would be unable to perform any of his past work, but would be capable of a limited range of sedentary work (Tr. 57). The VE stated that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") except with respect to the sit/stand option  which she stated was based on professional experience (Tr. 57-58).

In response to questioning by Plaintiff's attorney, the VE noted that light work generally required lifting up to 20 pounds (Tr. 58). She stated that if the individual were limited to 15 pounds lifting, he could perform light work because "anything over 10 pounds on an occasional basis is qualified as light work" (Tr. 59). She acknowledged that if the individual were limited to lifting 15 pounds and was unable to stand for more than one hour in an eight-hour work day, she would characterize the work as sedentary (Tr. 59). She stated that the inability to crouch or squat would not change her job findings, but the need to be

-10-

absent four days each month would preclude all gainful employment (Tr. 60). She found that the need to not only change position, but "walk around" periodically would also preclude all work (Tr. 60).

###      E.      The ALJ's Decision

Citing Plaintiff's medical records, the ALJ McKay found the severe impairments of "diabetes mellitus with diabetic peripheral neuropathy in the lower extremities; degenerative joint disease of the right knee with history of fractured lateral tibial plateau, status post ORIF and history of right knee arthroscopy" but that none of the impairments met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 15-16). The ALJ found that the conditions of "cataracts, retinal detachment, shoulder conditions, left hand cellulitis, left foot puncture wound, and marijuana use" were not severe impairments (Tr. 16). She found that Plaintiff retained the following residual functional capacity ("RFC") for light work with the following additional limitations:

> [L]imited to occasional climbing of stairs, crouching, crawling, kneeling, stooping and bending; and, must avoid working in proximity to workplace hazards such as moving machinery, unprotected heights, and climbing of ladders (Tr. 16).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to return to his past relevant work, he could perform the jobs of inspector and small products assembler (Tr. 18-19).

The ALJ discounted the claims of disability, noting Plaintiff's acknowledgment that he could lift 30 pounds (Tr. 17, 136). She observed that Plaintiff was able to work for many

years despite the alleged impairments (Tr. 17).  The ALJ rejected Dr. Teitge's March, June,

and August, 2011 opinions, noting that "Dr. Teitge saw the claimant only once, on March 11,

2011 in the two years prior to making these opinions (Tr. 17).   She noted that while Dr.

Teitge cited "objective signs," the bulk of his findings "derive[d] from [Plaintiff's] subjective

complaints" (Tr. 18).  She found that Dr. Teitge's opinions were not supported by objective

evidence and were "inconsistent" with Plaintiff's ability to work for many years and his

admitted activities of daily living (Tr. 18).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of*

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more

than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir.

1986)(en banc).  In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health*

*& Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).  The court must examine the

-12-

administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-13-

## ANALYSIS

### A.  The Treating Physician Analysis

Plaintiff argues first that the ALJ erred by according "little weight" to Dr. Teitge's March, June, and August, 2011 assessments.  *Plaintiff's Brief* at 11-13, *Docket #11* (citing Tr. 17-18).  Relying on *Gayheart v. Commisioner of Social Security,* 710 F.3d 365 (6th Cir.2013), Plaintiff disputes the finding that Dr. Teitge "saw Plaintiff only once" before issuing the March, 2011 opinion.  *Plaintiff's Brief* at 11 (citing Tr. 17).  He contends that the ALJ erred by finding that Dr. Teitge's opinion was not supported by objective evidence.  *Id.* (citing Tr. 17).

Plaintiff is correct that an opinion of limitation or disability by a treating source is entitled to deference.  "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight."  *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir.2009) (internal quotation marks omitted) (citing *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Wilson*, at 544 (citing 20 C.F.R. 404.1527(c)(2–6)).  The failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart, supra,* 710

-14-

F.3d at 376 (citing *Wilson*, at 544–446).

Contrary to this argument, the ALJ articulated thorough and well supported reasons for rejecting Dr. Teitge's opinions.   Plaintiff asserts that the ALJ erroneously found that Dr. Teitge saw him "only once" before issuing the March, 2011 opinion (Tr. 17).  However, this argument is based on a gross mis-characterization of the ALJ's findings which actually state correctly that "Dr. Teitge saw the claimant only once, on March 11, 2011, *in the two years prior to making these opinions*" (Tr. 17)(emphasis added).  Dr. Teitge stated in March, 2011 that he had not seen Plaintiff in two years (Tr. 277).  The ALJ did not err by observing that Dr. Teitge did not see Plaintiff for two years before issuing the first of three "disability" opinions.  *See Wilson* at 544-546.

Plaintiff's claim that the ALJ erroneously rejected Dr. Teitge's opinions because they were not supported by objective medical evidence likewise distorts the administrative findings.   In fact the ALJ acknowledged that Dr. Teitge "found objective signs upon examination of the claimant's limitations" but reasonably observed that "it appears that [Dr. Teitge's] more significant restrictions on the claimant's working capacity derive from the claimant's subjective complaints, such as inability to step over two feet without pain or collapsing" (Tr. 18).   The ALJ supported his finding by noting that Plaintiff was able to work for many years despite the alleged knee problems and engaged in a wide range of daily activities (Tr. 18).

Dr. Teitge's March and June, 2011 findings are problematic for additional reasons.

-15-

First, his March , 2011 opinion, stating that Plaintiff was "clearly disabled . . . from moving heavy factory machinery" (Tr. 278) and June, 2011 opinion that Plaintiff was unable to return to his work as an "iron worker" (Tr. 276) do not contradict the ALJ's finding that Plaintiff was unable to perform his former work at the heavy exertional work but was capable of a range of light work (Tr. 16).   While Dr. Teitge's August, 2011 assessment suggests a much greater degree of limitation, his finding of extreme limitation, such as the inability to climb stairs or lift more than 15 pounds (Tr. 260, 262) stand at odds with Plaintiff's own statements and testimony that he was capable of at least some stair climbing (Tr. 32) and lifting up to 30 pounds (Tr. 136).

Plaintiff also relies on the Medical Questionnaire completed by Dr.Teige in August, 2011 attached to his summary judgment motion. *Docket #11-1.*  While this evidence predates the ALJ's January 25, 2012 decision, it was not included in the material considered by the ALJ.  While under some circumstances, newly submitted material could provide grounds for a remand for further fact-finding under the sixth sentence of 42 U.S.C. § 405(g), counsel's failure to show "good cause" for the tardy submission forecloses remand. *Id.*  Even assuming that good cause could be established, the questionnaire, stating that Plaintiff would be unable to return to his former job as an iron worker, largely restates the March, June, and August, 2011 opinions already considered by the ALJ.   Because Plaintiff cannot show good cause for the tardy submission or that the new material would be likely to change the ALJ's findings, a remand for its  consideration is unwarranted.

-16-

### B.  The Omission of Vision Problems at Step Two

Plaintiff argues next that the ALJ erred by failing to include "vision issues" among the severe impairments at Step Two of the sequential analysis. *Plaintiff's Brief* at 13-15.  He contends, in effect, that vision problems create work-related impairments, citing his own statement that due to a right eye cataract, he is unable to see street names and addresses while driving (Tr. 131).  Plaintiff also relies on medical records showing that he underwent a procedure for retinal detachment, his reports of visual halos, and his testimony that his vision was clouded by "floaters" for several days at a time.  *Id.* at 13.

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir.1985). An impairment can be considered "not severe ... only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.' " *Id.* at 90 (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)). 20 CFR § 404.1521(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities."  "Basic work activities" include the capacity for "seeing, hearing, and speaking." *Id.*;  § 404.1521(b).

The ALJ declined to accept Plaintiff's allegations of significant vision problems at Step Two, stating that the "cataracts and retinal detachment do not cause more than a

minimal limitation on his functionality" (Tr. 15). Substantial evidence supports this determination. Plaintiff acknowledged multiple times that eye problems did not prevent him from driving. While he alleged that he experienced "floater" and blurred vision, ophthalomogical records creating in October, 2011 state that Plaintiff did not show signs of diabetes-related complications (Tr. 302). March, 2011 treating records state that a vitreous hemorrhage of the right eye was resolved with a laser procedure (Tr. 258). Notes from the same month state that the left eye appeared unremarkable (Tr. 245). Another treating source opined that Plaintiff's eyesight could be improved adequately with an updated eyeglass prescription (Tr. 278).

Even assuming that Plaintiff experienced  vision problems which ought to have been acknowledged at Step Two, so long as "an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two 'does not constitute reversible error.'" *Fisk v. Astrue*, 253 Fed.Appx. 580, 583, 2007 WL 3325869, *4 (6th Cir.November 9, 2007)(citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987)).   Here, assuming the vision problems were included with the Step Two impairments,  a non-disability finding would still be directed.  In response to the ALJ's query, the VE testified that if Plaintiff were limited to work requiring a sit/stand option *and* the need to avoid work requiring "fine visual acuity," he would nonetheless be capable of performing 3,500 jobs in the local economy (Tr. 55).  I am unaware of any case law suggesting that 3,500 job in the local economy does not

constitute a "significant number" for purposes of a Step Five analysis. *See Born v. Secretary of Health & Human Services,* 923 F.2d 1168, 1174 (6th Cir.1990) (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir.1988)) (1,350 jobs in the local economy constitute a significant number); *Martin v. Commissioner of Social Security,* 170 Fed.Appx. 369, 375, 2006 WL 509393, *5 (6th Cir. March 1, 2006) (870 jobs in the claimant's geographic region a significant number).   Because the effect of the alleged vision problems was addressed at Step Five of the analysis, the omission of the "vision issues" at Step Two does not constitute grounds for remand.

### C. The Credibility Determination

Plaintiff argues next that the ALJ's credibility determination was based on misstatements of the record. *Plaintiff's Brief* at 15-16.  He faults the finding that his testimony contradicted his earlier statements regarding his functional capacity. *Id.*  He contends that his earlier account of his functional abilities actually comported with his testimony at the administrative hearing. *Id.*  Plaintiff also argues that the ALJ erred by citing the continued ability to work to discount the allegations of limitation. *Id.*  He disputes the finding that his claims were unsupported by objective findings, citing Dr. Teitge's observations of "cracking and popping of the knee," and crepitation of the knee joint. *Id.* (citing 277-279).

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms.  "First, the adjudicator must consider whether there is an underlying

-19-

medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2.  The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."*Id.* [4]

The ALJ did not err in finding that Plaintiff's original account of his functional abilities differed from the hearing testimony.  For example, while Plaintiff indicated in March, 2011 that he could lift 30 pounds (Tr. 136), he testified at the January, 2012 hearing that he was unable to lift any significant weight (Tr. 47).  Plaintiff's original statement that he could prepare meals for up to 30 minutes at a time (Tr. 133) stands at odds with his hearing testimony that he was unable to stand for more than 20 minutes (Tr. 47).

The conclusion that Plaintiff's allegations of disability were undermined by his ability

---

[4]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

 (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

to work for several years after the onset of the knee condition is also well supported. Plaintiff's testimony at least suggests that he stopped working at the point he was eligible to collect a pension rather than as a result of disability (Tr. 36).   Plaintiff's admission that he continued to look for renumerative work (Tr. 38) also undermines the disability claim.  While he also disputes the ALJ's finding that his limitations were not supported by objective medical evidence, I note that the ALJ did not find the absence of objective evidence, but rather, rejected Plaintiff's *alleged degree* of limitation as a result of his conditions (Tr. 17). Accordingly, the deference generally accorded the ALJ's credibility findings is appropriate here.   "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters v. Commissioner of Social Sec.*, 127 F. 3d 525, 531 (6th Cir. 1997); *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir.1993);  *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir.1989) (*citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986)) (An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

### D.  The Hypothetical Question and Vocational Testimony

Plaintiff's fourth and fifth arguments pertain to the ALJ's choice of hypothetical limitations to the VE and the job testimony.   He contends, in effect, that omission of some of his professed limitations from the hypothetical question to the VE invalidates the job testimony. *Plaintiff's Brief* at 16-19.  He argues on a related note that while the VE found that the hypothetical limitations allowed for exertionally light work,  his inability to lift more

-21-

than 15 pounds limited him to sedentary work.  *Id.*

Plaintiff's argument that the ALJ ought to have included all of the alleged limitations in the hypothetical question to the VE is not well taken.   Plaintiff is correct that a hypothetical question constitutes substantial evidence only if it accurately portrays the individual's relevant impairments.  *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir.1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir.2004).  Nonetheless, as discussed above, the ALJ provided well supported reasons for discounting Plaintiff's alleged degree of impairment as a result of pain, knee mobility, and eye problems (Tr. 17-18). Having permissibly rejected those claims of limitation, he was not required to include them in the hypothetical question to the VE.    *See Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118–119 (6th Cir.1994) (ALJ not obliged to include properly discredited allegations of limitation in hypothetical to the VE).

Plaintiff's overlapping claim that the limitations posed to the VE limiting him to 15 pounds lifting describes exertionally sedentary work rather than light work is a red herring. The "15-pound" limitation was not included in the hypothetical question forming the basis of the RFC or job findings in the administrative opinion (Tr. 53).  The hypothetical question upon which the RFC was based stated only that the individual was capable of light work,

indicating the ability to lift up to 20 pounds (Tr. 53); 20 C.F.R. § 404.1567.   In fact, Plaintiff's counsel posed the 15-pound limitation in an *alternative* hypothetical question which included the 15-pound limit and other alleged limitations which were ultimately rejected by the ALJ (Tr. 59).  Although Plaintiff disputes the VE's finding that "anything over 10 pounds on an occasional basis is qualified as light work," this testimony, elicited by Plaintiff's counsel, was in response to a question including all of Plaintiff's claimed limitations rather than the question forming the basis of the RFC (Tr. 53, 59).  The VE's earlier testimony clearly indicates that when making the job findings in response to the adopted limitations, the hypothetical individual described by the ALJ could lift up to 20 pounds occasionally (Tr. 58).

My recommendation to uphold the Commissioner's decision on this application should not be read to trivialize the consequences of Plaintiff's knee condition, and it might well be different if this were *de novo* review.  Nonetheless, the ALJ's determination that he was capable of light work is within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

However, Plaintiff, now 57, is not prevented from reapplying for benefits if he believes that his condition has worsened since January 25, 2012.  Moreover, given Plaintiff's current age, a finding that he was limited to exertionally light work would result in a disability finding.  A determination that an individual 55 or older is capable of only unskilled,

exertionally light or sedentary work directs a finding of disability. *Preslar v. Secretary of Health and Human Services*, 14 F.3d 1107, 1111 (6th Cir.1994); 20 C.F.R. § 404, Subpart P, App. 2, Rule 202.04; *See also Parks v. Commissioner of Social Sec.,* 2014 WL 1305033, *10 (E.D.Mich. March 31, 2014).

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The

response shall address specifically, and in the same order raised, each issue contained

within the objections.

                                        s/R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

Dated: July 31, 2014


                        CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on
July 31, 2014, electronically and/or by U.S. mail.

                                        s/Carolyn M. Ciesla
                                        Case Manager to the
                                        Honorable R. Steven Whalen

-25-